David Anson for David Anson. Okay. All right, Mr. Delaney. May it please the Court that in the case of Stonelight Tile v. Bay Area Air Quality Mgmt District, the Stonelight Tile would like to submit on the briefs that we submitted previously. We believe that all of the issues have been adequately briefed in those. However, during oral argument, what I would like to do is I'd like to bring up a few background points that might set the stage as to what was a chance for rebuttal. And, Mr. Anson, I'd like to reserve four minutes for Mr. Anson to address claims that are relate only to Mr. Anson. Stop the Court for just a minute. Go ahead. With reference to the Stonelight arguments, the basic premise that Stonelight advocates is that the American judicial system is founded upon the jury system, and the jury verdict should be protected at all costs unless there is an error such that no reasonable jury would find such. And in the case of both of the cases of due process and on equal protection, it's clear from the underlying trial that the jury found liability in both cases. And what is at question here is the matter of damages. With respect to damages, it is included in our brief that Mr. Allman quantified the damages for the district. We have also pointed out in the brief that Ms. Sally White, the expert who quantified the damages on behalf of the district, had an unfamiliarity with the basic facts, and we pointed out on page 32 of our brief some of the items where we found problems with what Ms. White had done. Also, Mr. Anson also presented $2.1 million in damages. So I think with respect to the damages claim, there is no doubt that Mr. Allman quantified the damages for the district. There is a basis for a new trial on damages alone due to the fact that there was substantial evidence to show that the quantum of damages were different than what the testimony presented. As a background, I'd like to indicate or identify a motion in limine. There was an early motion in limine where Stonelight had requested that any award of damages at the previous trial with diversified in state court be prohibited from coming into evidence. We lost that motion in limine. The court ruled that with respect to the fact that there was a previous trial, that that could come into evidence. However, in addressing what came in in the previous trial, we attempted not to provide any evidence to the court, and that was due to the fact that Stonelight had not recovered in the earlier trial. Did your brief raise this issue about the motion in limine? It does not. Then why are we hearing about it? I wanted to provide some background that in Judge Ware's order on post-trial motions on page 528 of the excerpts of record, he indicates that the jury heard that the plaintiffs had recovered damages against diversified for harm. And where that's significant is that the judge, in ruling that the damages of $50,000 for Anson and $1 for Stonelight were adequate, was based upon his underlying principle or statement that the plaintiffs had recovered damages. That was in error. The plaintiffs had recovered damages against diversified for harm. They had recovered a jury verdict, but had not recovered damages, because the damages were unrecoverable, and a collection attorney had informed Stonelight, due to bankruptcy proceedings and the status of diversified's financial status, that those damages might not be recoverable. So based upon the fact, if the judge was ---- You must have gone to a different law school than I did. When you win a jury verdict and the jury says, we award X point dollars, you've recovered that amount, you may not ever collect it. Correct. Because you've recovered. That is true. Right? That is true. And did Judge Ware use the term collect? No, he used the term recovered. He used the term recovered. But what we were raising in our arguments is that there may have been an increase in the amount of damages that the jury had recovered against diversified for harm. And interpretation by the jury that they may have misinterpreted. Secondly, with respect to Milton Feldstein's direct involvement, Milton Feldstein was the APCO, and as we had indicated in our brief, the Health and Safety Code of California, sections 4750 and 4752, make the APCO of the Bay Area Air Quality Management District the one individual in California that is responsible for enforcing the Environmental Protection Act, the California Clean Air Act, and so forth. We indicated in our brief as to how Mr. Feldstein's direct involvement was ---- laid the basis for establishing that there was an official policy, or if not an official policy, that there were persistent pattern of conduct that was shown. I'd like to reiterate five specific acts that Mr. Feldstein was involved in. And these did not come out at ---- these were indirectly addressed at trial, but were not directly pointed out in our brief. One of which is that Mr. Feldstein had passed away prior to the filing of the complaint, so we were not able to get testimony from Mr. Feldstein at the trial. But one of which was that Mr. Anson was singled out and could not get records from the Bay Area without Mr. Feldstein's approval. And this was shown in our excerpts of record at pages 73 to 75. Mr. Anson believes that he was denied an access to public records by Milton Feldstein, the APCO. Also, we had indicated that the inspectors had indicated they were ordered not to cite violation notices. This was Mr. Kriziak's testimony. The inspectors found violations that they could have cited but did not cite. That was Mr. Argyle. I thought he said that that did not include dust violations. Is that what he said? The district's position is that it did not include dust. I thought he said that. I'm not talking about the district's position. I thought that's what he said. Mr. Kriziak, in his examination from the district, had indicated that it related to the flying of metal objects. However, when I approached Mr. Feldstein about this examination, and as is pointed out in our brief, we took him through a series of questions related to dust, and he did later indicate that it was dust. In fact, Mr. Kriziak even testified, as is shown in our brief, that this was one of the, in the seven years of experience that he had had in his career, this was the most expansive dust problem that he had encountered. Also, with respect to the permit being issued over the recommendations of Mr. Sals, Mr. Sals, Mr. Sals, Mr. Sals, Mr. Sals, Mr. Sals, Mr. Sals, that came out in the testimony of Will Sals. It's clear from the testimony that the inspectors, Sals, Kriziak, and Argyle, were directed at points by Mr. Brown, Mr. Guthrie, Mr. Bean, and Mr. Feldstein, and the supervisory acts are seen to permeate the entire chain of command up to the APCO. And I'm not going to go into the details of the APCO, but I know that Mr. Feldstein and Mr. Kriziak were both in the APCO, and Mr. Feldstein was the supervisor of the APCO, and Mr. Feldstein was the supervisor of the APCO. Also, did I hear you correctly at the start? Stop the clock for just a second. I'm just trying to keep track of time here. You wanted to reserve four minutes for Mr. Anson. Four minutes for Mr. Anson. Also, in the excerpt of record, page 184, Mr. Feldstein allowed the permit from Diversified to be extended to Diversified from the Duradon letter, which was juxtaposed to the recommendation of Mr. Saltz. And also, Mr. Saltz also testified that Milton Feldstein called him directly into his office, which was highly unusual for the APCO to call someone in unless the APCO was playing a direct role in that project. Also, in excerpts of records 73 to 75, Mr. Anson was testifying with respect to Rochelle Walker. Rochelle Walker was a person working at the Bay Area who was in charge of records, and Mr. Anson testified that Rochelle Walker told him that any request had to be directed to Milton Feldstein, and yet these were requests for access to public records. There was also the issue of the document destruction, which was outlined in our brief, and also there was a fact of a privilege log. So what Mr. Anson is trying to express here is that with reference to the due diligence that Mr. Anson undertook, he undertook extensive due diligence. However, despite any attempt that he made to obtain records, he never would have obtained those records anyway due to policies that had been presented by the Bay Area. We're at that point right now. Okay. Mr. Anson. Mr. Anson. The pleas of court, I'm not an attorney, but I'm representing myself in this appeal, and I ask the court to consider those matters that are raised by Stonelight's counsel, apply equally to Plaintiff Anson. There are several apparent errors by the presiding judge during the trial and post-trial, and I'd like to address first the matter of costs. On November 1, 2002, Anson submitted costs application for $49,939.76. That's evidence in docket number 189 at excerpts of record 430 and 434. The summary reshoot is on ER 434. On February 3, 2003, court granted Anson's application for costs. That is at ER 525. On February 11, just eight days later, in 2003, BAQ asked for a clarification. That is at ER 568 to 570. On February 19, 2003, the court grants a clarification order. However, the judge errs in the amount Anson requested, stating it was $12,736 when Anson actually asked for $49,939. Court has misconstrued Stonelight's costs with Anson's costs. That is at ER 567 through 568. Anson was in the process of responding to clarification by preparing pleadings when on February 19, 2003, the court had already decided the issue of costs without allowing Anson time to respond. The court had reached the decision in eight days without giving Anson time to reply. That is at ER 567, 568. Even if the court had been correct in allowing BAQ's challenge of $10,000 odd to Anson's costs, it would still have awarded costs to Anson of $39,749, not the $2,500 odd, which was the erroneous amount the court calculated. However, there was no challenge by the BAQ to Anson's costs. I request the court find for Anson the full amount claimed of $49,939.76. On the matter of damages that Mr Delaney has already spoken about, there has to be some reason why the jury found for us on all counts he had only come up with a $1 minimum damages award. I'd like to speak to the damages documents in evidence. Stonelight Tile and Anson's memo for a new trial, that's ER 392, sets forth the trial evidence which substantiated Anson's damages at $2,143,565. That's at ER 354. The jury raised questions to the court on ER 390. Are there any financial documents we can see? The court responded, there are no documents in evidence for you to review. This was incorrect as the bankruptcy documents and the demonstrative documents were already admitted. That's ER 187 for 238, 358 and 269 through 278. Anson believes that the bankruptcy documents were removed from the evidence table by BAQ counsel. This is evidence at S2ER 551, 552 and 554. Anson put the documents on the table. BAQ counsel Snyder removed them. That's evidence at S2ER 554. Snyder admits taking these documents back. I'd like to deal quickly with a comparison. Judge Ware, on page 5 of his transcript dated 10902, volume 8, in his instructions the jury stated, and I quote, It is your duty to find the facts from all of the evidence in this case. And are those facts? You're now into Mr. Delancey's time. Thank you for your argument, Mr. Anson. We'll hear from Ms. Snyder at this point for the Bay Area Equality Management District. Good morning, Your Honors, and I'd like to apologize for my voice. I'm just getting over a cold. I'd like to focus my argument on the district's motion for summary judgment. On statute of limitations, statute of limitations are favored in the law. In fact, the Supreme Court has said that they're vital to the welfare of society. In this case, the statute of the one-year statute of limitations began to run when Stonelight and Mr. Anson were on inquiry notice of their claims. The facts show through a reasonable due diligence, Stonelight, Anson would have, in fact, did, were on inquiry notice of their claims by November of 1994. Does the summary judgment itself matter so much? It seems to me that on the day of trial, the Court ruled not only that it wasn't a summary judgment matter, but ruled against you, period, said there's not a statute of limitations problem, and then no evidence was put in front of the jury, and that was the end of the statute of limitations question. Am I right? Right. And because it was not submitted to the jury, this is an appeal issue, and it's to be reviewed de novo. So whether it was a summary judgment or not, you have a ruling directly by the trial court saying there is no statute of limitations bar, and you're attacking that, right? Yes. Yes. Actually, that's correct. I am attacking that, and that is to be reviewed de novo. There was four basic allegations made in the complaint. It's essential to note that there's no issue of fact as to whether any of the accusations made by Stonelight Anson were made prior to November of 1994. The first allegation in the complaint is that the district conspired to not prosecute plaintiff's claims for dust pollution against Diversified. In February of 1994, Mr. Anson accused the district of purposefully delaying its response to Stonelight and Anson's complaints against Diversified. In November of 1994, Stonelight and Mr. Anson accused the district of internally conspiring to not cite Diversified. This shows inquiry notice of all allegations that the allegations of the allegation against the district that it did not respond to complaints. The next allegation made in the complaint is that the district conspired to purposefully not cite Diversified for dust for political reasons. In January and February, Mr. Anson accused the district of instructing inspectors not to cite Diversified. And, in fact, Mr. Anson claimed that he had someone who could testify under oath that that was happening. Mr. Anson challenged the district to deny that Diversified was given preferential treatment because of political interference from Rod Dearden. Mr. Anson also accused Rod Dearden of accepting political contributions from the owner of Diversified the day after a permit was issued to Diversified. Again, this shows inquiry notice of not citing Diversified for political purposes. And in the original filing, you didn't raise the statute of limitations with respect to the Federal claims, right? Right. Those were on the State issues, the items that needed to be addressed by a government tort claim. The case came back and to the district court, and the plaintiff simply took out the State claim. Correct. And at that point, you amended your answer and pled it. Right. Pled a statute of limitations defense. Why doesn't law of the case say you can't raise the statute of limitations defense? This was actually – there was never any challenge to the amended, the first amended complaint. Those challenges were to the original complaint. The plaintiffs filed a new complaint. A new answer was – It wasn't new. They just dropped the State allegations, right? Actually, they also amended their complaints, not just dropped the State allegations. But I think this all happened before our law firm was involved in the case. The difference does that make? I'm just not as familiar with the record. In fact, as it came back, the answer was amended. It was not stricken. It was not attacked. It was just amended, and there it was. Is that correct? The answer was amended to add a statute of limitations. Correct. Cause of action. And we have sent it back because there had not been a statute of limitation in the answer before. It had not been pled. So it came back. The complaint was amended. The answer was amended to include it. Correct? Correct. Okay. Actually, I believe that the answer was amended, and then subsequent to that, the complaint was amended. And then the answer didn't need to be amended because a new answer was filed as to the complaint, as to the amended complaint. So you filed an amended answer before the complaint was amended? Is that right? Do I hear you correctly? I believe so. And then there was an amended complaint, so a new answer was filed. Is there a difference, factually, in the district's mind between a citizen thinking that a regulatory body has not done its job and having proof that it intentionally did not do so? Yes. There is quite a difference, and I think that's where this case lies. Mr. Anson did believe that there were problems with the district. However, there was no proof of that. So if he had attempted to file and pursue the complaint that we're looking at now before he learned the discovery in the State proceeding, it would have been subject to dismissal? Actually, there was no State proceeding. He had filed the State claims in Federal court also. But his contention, Stonelight Nansen's contention, as I understand it, is that they didn't learn what really happened with respect to the actions of your client until discovery in their State proceeding against Diversify. Do I have that right? Isn't that their contention? No. They're contending that they first learned of their claims against the district when they spoke to one of our district inspectors at the Stonelight Tile office in 1997 while they were preparing their case against Diversify. Now, the issue we have here is that inspector didn't provide any new information that had not been provided to Mr. Anson prior to that time. They admit that they were on inquiry notice when they spoke with Inspector Kryziak in 1997. When was the first time they had an affidavit? I believe after the lawsuit was filed. And when was that the first time the inspector said under oath, this is what really happened? There was a trial between Stonelight Tile and Diversify. And at that trial, the inspector testified. And said that we deliberately didn't cite Diversify, and the reason we didn't was because of political contributions made to people up the chain and that sort of thing? I don't believe that the testimony was that direct. He basically testified that his supervisor had instructed him to modify reports, but he claimed it was to basically improve the reports and that it did not relate to dust. And did his description change? No. He claimed at the trial between Stonelight Tile and the Bay Area Air Quality Management District that he was instructed to modify reports with respect to metal recycling, but that did not affect the dust situation. And he was also instructed to modify with respect to having the water on constantly. But again, that did not affect the dust situation. Okay. Go ahead. So basically what we have is all the allegations in the complaint were either made before November of 1994, or they were inferred before November of 1994. The only one that wasn't made directly was that the reports were modified or altered, but that could be inferred by Mr. Anson's accusations that he had been told, and he would have a witness under oath, that the instructors were instructed – I'm sorry, that the inspectors were instructed not to cite Diversify. This was all done before November of 1994. Given the far-reaching accusations, there's really no excuse for Stonelight Anson to not have exercised due diligence within that one-year period after he accused the district of internally conspiring not to cite Diversify. During that one-year period, he could have exercised due diligence and found any information that he needed to know, if any. I mean, as it turns out, there was no new information that he obtained after 1994 that could not have been inferred. There's no reason that Mr. Anson could not have spoken with the inspector prior to 1995, because he admits that when he spoke with Mr. Kryziak in 1997, that was at Stonelight Tiles' offices. With respect to documents, Mr. Anson has admitted in deposition and at trial that he did obtain documents from the district. He named a specific person at the district. He said he told that person which documents he needed, and that that person not only provided the documents, but they even mailed the documents to him. So he did, in fact, obtain documents from the district. Given the wide-ranging accusations as of November 1994, this showed that Stonelight Anson were aware of facts which would have led a reasonable person of ordinary intelligence, through the exercise of reasonable diligence, to discover the alleged injury. There's no dispute as to the facts. The district believes that summary judgment must be granted on behalf of the district. I'd also like to address the issue of the appeal of the motion for judgment on the equal protection claim. The jury was deadlocked on the equal protection claim. The judge declared a mistrial. The district brought a motion for judgment on that claim, which was granted. For equal protection, there must be a comparison. At trial, there was no comparison with other sites. In the brief, Stonelight Tile and David Anson try to use two comparisons. One is the comparison of enforcement with Stonelight Tile itself, and the other is at a fair level of comparison. The district's testimony fails substantially because this was not raised in the expert report, neither that they were similarly situated or there was any comparable enforcement action between the two. It also fails substantively because the district required Stonelight Tile. The testimony showed that the district required Stonelight Tile to install abatement equipment in order to control emissions, but it chose not to do so. The district also required Diversified to install abatement equipment, and Diversified chose to try to make abatement, take abatement actions. Suppose, hypothetically, someone is suing the fire department because, like in Fahrenheit 451, the fire department was setting fires, not putting them out, and among their other complaints was equal protection. Would they have to prove that ordinarily the fire department is charged with the job of putting out fires, not starting them? I don't know if that case would fall under an equal protection claim or a due process. Let's say that that's their – they've made a claim for equal protection. You know, you go around normally, your job is to go around and put out fires. When it came to my business, you set it on fire. Would they have to establish the contrary? Would they have to prove up that ordinarily this fire department put out fires? I believe they would have to show some type of different action between their interests and an interest of the other. It wouldn't be enough, in your view, for equal protection purposes to demonstrate that the department or agency did something that was totally contrary to their purpose. That case being so extreme, it almost goes without saying that a fire department does not set fires. How about a regulatory agency that lets a polluter pollute, does it deliberately? I think that would be a due process issue, not an equal protection issue. Because if the entity is – if the pollution control district is allowing the entity to pollute equally among various businesses or allowing other entities to pollute, I think they would either have to show that other businesses were not affected the same way or that the district also allowed other polluters – did not allow other polluters to pollute in the same manner. And that's really the crux of the equal protection claim. Roberts. Thank you for your argument. Rebuttal. Mr. Delaney. Yes, Your Honors. Thank you. First, I'd like to touch on the equal protection argument that Ms. Snyder raised. With respect to equal protection, she claims that there was no comparison or valid comparison in the underlying trial. The fact of the matter is that there were four points of a comparison. One is Stonelight compared its grinding plant being shut down earlier. Secondly, Mr. Saltz, on page 117 to 120 of the excerpts of the record, indicated that the Barnard Avenue site was treated more harshly than the diversified site was. That was the second comparison and the major comparison. Thirdly, the jury instructions on page 9, the judge indicated that no comparison was needed if you could show that the district was either not following its procedures or was violating pollution laws. And that was prior to the jury being instructed. Then after the jury went to deliberations, the jury then raised a question and they said, Your Honor, can we consider the fact of just Stonelight being a comparison or do we have to compare it to a third party? And the judge in that question, he answered, you can compare it to either. If you find comparison of Stonelight or with a third party, that will satisfy as long as you show you can show disparate treatment with respect to those comparisons. So those four points indicate that there was a comparison. The reason that we did not have a direct comparison is because Mr. Anson was trying to get records on the Barnard Avenue and was denied access to his public information requests. At trial, we got some of those prior to the trial, and our expert witness prepared a report which did conclude that there was disparate treatment that would establish equal protection. However, we were denied by a motion in Lemonade from putting that into evidence because our expert witness did not include that in his expert witness report. Thank you. Thank you, counsel. Thank both sides and Mr. Anson for your arguments. The case disargued will be submitted and the court will stand in recess for the day. Thank you.
judges: Fernandez, Hawkins, Thomas